# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**JAMES RENNE,**

      **Plaintiff,**

      **v.**                     **Case No. 5:21-cv-04032-HLT-ADM**

**NEXTERA ENERGY, INC., et al.,**

      **Defendants.**

## MEMORANDUM AND ORDER

This case arises out of the construction of wind turbines in Kansas. Plaintiff asserts claims of nuisance and inverse condemnation against Defendants, which are various corporate entities alleged to be involved in the construction of the wind farm. Plaintiff also seeks to bring a class action on behalf of a nationwide class regarding land-use contracts that he claims are legally invalid. Defendants filed two motions to dismiss. Both motions seek dismissal of all claims in the case for identical reasons, and one additionally seeks dismissal of three Defendants for lack of personal jurisdiction. Docs. 40, 42. For the reasons stated below, the motions are granted in part and denied in part. Plaintiff's nuisance claim against Defendant Solider Creek survives. All other claims and parties are dismissed.

## I.     BACKGROUND[1]

Plaintiff brings this case on behalf of himself and a similarly situated class. Plaintiff is a citizen of Virginia but owns property in Nemaha County, Kansas. Doc. 35 at ¶ 3. Plaintiff's property adjoins property with a large industrial wind turbine. *Id.* Although Plaintiff previously

---

[1] The following facts are taken from the second amended complaint and are assumed to be true for purposes of evaluating Defendants' motions to dismiss.

had a land-use agreement, he repudiated it because of Defendants' business practices and returned a check for $4,750, which Defendants cashed. *Id.* ¶¶ 20, 27. Accordingly, Plaintiff is a "non-participating landowner" in relation to the wind-turbine project. *Id.* ¶ 30.

Defendant NextEra Energy, Inc. ("NEE"), is a corporation based in Florida that is engaged in wind power generation. *Id.* ¶ 4. Defendant NextEra Energy Capital Holdings, Inc. ("NECH") is likewise a Florida corporation. *Id.* ¶ 5. Defendants NextEra Energy Resources LLC ("NEER"), NextEra Energy Constructors LLC ("NEC"), NextEra Energy Operating Services LLC ("NEOS"), NextEra Energy Project Management LLC ("NEPM"), and Soldier Creek Wind LLC ("Soldier Creek") are subsidiaries of and are substantially controlled by NEE and NECH, and they "share key executive officers, decision-making processes and personnel, the same corporate headquarters offices and facilities, shared work processes, and same exact address with" NEE and NECH. *Id.* ¶ 6; *see also id.* ¶ 8. Plaintiff alleges that the "array of Defendant subsidiaries and affiliates form the same joint venture and common enterprise related to Plaintiff's and the putative class' claims," which renders them jointly and severally liable for all the harm alleged in the complaint. *Id.* ¶¶ 7, 12.

The second amended complaint includes the following allegations against Defendants:

- NEE "is the parent corporation to all other listed Defendants but also jointly, severally and actively participated in approval, development and the decision to develop at that location, oversight, ratification, direction, and/or supervision vis-à-vis other Defendants' actions related to the nuisances in this case that continue to harm Plaintiff" and "was jointly and severally involved in all acts alleged against other Defendants." *Id.* ¶ 9.

- NECH "is a parent financing and economic backing company to all other listed Defendants and jointly and severally participated in financing and economic activities directly and/or as part of a joint venture with other Defendants related to the nuisances that continue to harm Plaintiff" and "was jointly and severally involved in all acts alleged against other Defendants." *Id.* ¶ 10.

- NEER "operates as an action arm of [NEE and NECH] providing primary oversight and an action conduit by which to direct activities throughout the entire NextEra Defendants joint venture and enterprise consisting of hundreds of subsidiaries" and "is heavily involved in all aspects of development for a new industrial wind turbine array like the massive Soldier Creek Wind LLC Project . . . in Nemaha County, Kansas at issue in this case and was directly involved both in and out of Kansas with all aspects to include but not be limited to preparation, development, the decision to develop at that location, finance, construction, compliance, regulatory and legal, public interface and communications as well as follow-on operations to include but not be limited to all aspects surrounding the turbine towers built and operated along the western fence line of Plaintiff's property described above," and "was jointly and severally involved in all acts alleged against other Defendants." *Id.* ¶ 11.a.

- NEC: "based on its name alone it is reasonably certain to have been involved with aspects of the siting, approval, quality assurance, placement, and construction of the turbine towers that continue to harm Plaintiff" and "was jointly and severally involved in all acts alleged against other Defendants." *Id.* ¶ 11.b.

- NEOS: "based on its name alone it is reasonably certain to have been involved with aspects of the siting, approval, quality assurance, and other activity concerning the development and current operations of turbine towers that continue to harm Plaintiff" and "was jointly and severally involved in all acts alleged against other Defendants." *Id.* ¶ 11.c.

- NEPM: "based on its name alone it is reasonably certain to have been involved with aspects of the siting, approval, quality assurance, and other activity concerning the development and current operations of turbine towers that continue to harm Plaintiff" and "was jointly and severally involved in all acts alleged against other Defendants." *Id.* ¶ 11.d.

- Soldier Creek "is the local subsidiary in the overall enterprise that has been involved with every aspect of the Project to include but not be limited to its development, planning, siting, finance, current operations, construction and compliance, public interface among many other activities that continue to harm Plaintiff" and "was jointly and severally involved in all acts alleged against other Defendants." *Id.* ¶ 11.e.

The remaining allegations in the second amended complaint are alleged generally against Defendants collectively. *Id.* at 6 n.2. The Court will do likewise for purposes of setting out the facts alleged in the second amended complaint, with the caveat that Defendants' objection to this collective pleading style is addressed below in the analysis.

Defendants have developed, constructed, and operate a wind-energy project in Nemaha County, Kansas. *Id.* ¶ 14. Defendants are the largest producer of wind energy in the world and have knowledge and experience about the "devastation" these developments cause. *Id.* ¶ 15. Many of Defendants' "wind farms" have caused complaints and lawsuits by neighbors whose use and enjoyment of their property has been disrupted. *Id.* The towers "have three rotating 260 foot long blades and are topped with powerful navigational bright red aviation strobe lights firing in sync each few seconds throughout the entire nighttime hours that can be seen for miles across entire counties." *Id.*[2] Plaintiff alleges that wind-tower fields blanket the southern half of Nemaha County and create disturbances as well as "significant and unnatural amounts of noise and strobe light flashing at night that is especially agitating to neighbors in the normal, bird-chirping quiet and normally starlit night sky of rural Kansas." *Id.* The noises generated are often continuous and equate to "the sound of a passenger jet passing overhead that never moves out of earshot or, at other times, with deep thumping regularity akin to an approaching helicopter that never seems to land or depart the area." *Id.* The towers also create sunlight "flicker," strobe light effects, and obstruct the views of the surrounding landscape. *Id.* "Non-participating" neighbors who have towers built on the surrounding land have degraded family homesteads and farms, and the wind turbines are so annoying that most people would choose to not work or live near them. *Id.*

---

[2]   The complaint alleges elsewhere that the towers are 495 feet tall and have "400 foot rotating arms." Doc. 35 at ¶ 14.

Regarding Plaintiff's own land, he alleges that Defendants built a wind turbine "with almost no substantial set back from Plaintiff's property line and far too close to a dwelling on Plaintiff's property creating a substantial and unreasonable interference upon his land, an ongoing nuisance, and a danger to anyone in the vicinity of that portion of his property." *Id.* ¶ 31. Plaintiff intended to build a residential dwelling and stand-alone chapel near his western property line and had begun initial planning. *Id.* During the pandemic, Plaintiff's plans were delayed, and in that time, Defendants bult the wind turbines. *Id.* As a result, Plaintiff has abandoned his plans for a residential dwelling and chapel. *Id.* Plaintiff's neighbor has also reported seeing ice sheets being thrown from the wind turbine blades onto Plaintiff's property. *Id.* ¶ 32.

Despite knowing the disruptive nature of "wind farms," Defendants have put them near non-participating properties. *Id.* ¶ 16. Defendants often ignore placement and siting limitations and bully and threaten landowners and communities who challenge them. *Id.* ¶ 17. Plaintiff alleges that Defendants misled officials in Nemaha County about whether set-backs would be observed. *Id.* ¶¶ 18-19. In reaching a Development Agreement dated February 26, 2020, Defendants represented to the Nemaha County Board of Supervisors that only seven non-participating landowners were out of compliance with agreed set-back requirements, and that all such landowners had been offered a settlement. *Id.* ¶ 19. Plaintiff's property was not included in that list. *Id.* Plaintiff contends the Nemaha County Board of Supervisors signed the Development Agreement under false pretenses created by Defendants that all set-back provisions would be observed. *Id.* ¶¶ 21-22.

Plaintiff contends that Defendants' actions have caused him to sustain "a monumental and substantial annoyance, interference, and loss of the use and enjoyment of his property" and have "inhibited his ability to realize the full value and use as a homestead/farmstead, when trying to use his property as he would like, or sell the property, due to Defendants' nearby massive structures

sited too close by." *Id.* ¶ 23. He alleges that "Defendants knew that Plaintiff was a non-participating landowner of an adjacent parcel of land to sites on which they simply wanted to construct huge wind turbines too close to the property line and a dwelling and couldn't be bothered with whether it would cause a huge nuisance . . . ." *Id.* ¶ 25. Defendants "jointly and severally" had knowledge of the nuisance. *Id.* ¶ 26.

The second amended complaint alleges four claims. Counts 1 and 2 are for intentional private nuisance and private nuisance based on negligence. *Id.* ¶¶ 34-38.

Count 3 is a declaratory judgment class action. *Id.* ¶¶ 39-64. Plaintiff seeks to represent a nationwide class of homeowners "defrauded" into becoming participants in their wind farms. *Id.* Specifically, Plaintiff alleges that:

> Defendants induce the victims to unilaterally sign written contracts but advise them that the final decision on the contracts needs to be approved by the joint venture/common NextEra corporate enterprise in the home office in Juno Beach, Florida. The Defendants know they never intend to send the counter party back the signed, allegedly executed contract, copy thereby making their conduct and representations concerning the operative documents false and misleading. The intent of the Defendants is to obtain signed offers from the homeowners creating a wide-open power of acceptance. They can immediately enforce them against the homeowners at will on their timing, but they know the homeowners are unable to enforce their rights under the documents under nationwide applicable statute of frauds related to requirements that real estate contracts must first be demonstrated to be in writing to be enforceable. Then they engage in a practice of not sending the homeowners signed copies of the alleged contract documents thereby ensuring that there is no mutuality of obligation as only Defendants can enforce, or at a minimum are materially and unlawfully advantaged, under the circumstances of these alleged "agreements."

*Id.* ¶ 44. Plaintiff contends that any "contract" obtained by getting a signature and then not sending back a countersigned copy is unenforceable and he seeks injunctive relief on behalf of himself and

a class of similarly situated persons "of the nullity and unenforceability" of these contracts, and an order barring their entry as evidence in this case. *Id.* ¶¶ 49-52. The proposed class is described as:

> All owners of property in the United States or its territories who signed alleged land use documents related to one of NextEra Defendants' projects and never received a copy of the countersigned, or allegedly executed, final documents back from Defendants but were led to believe a land use related contract thereby was created by those same documents.

*Id.* ¶ 55. Plaintiff, who is an attorney, seeks to serve both as class representative and as class co-counsel. *Id.* ¶¶ 61-64. Another attorney who is not a party to this case also seeks to represent the class as co-counsel.

Count 4 is for "inverse condemnation under government authority." *Id.* ¶¶ 65-69. Plaintiff alleges that the wind-turbine project in Nemaha County is a public works project done "under color of government authority" and that Defendants are liable for inverse condemnation because the placement of wind turbines with less than the agreed set-back is a taking. *Id.*

For relief, Plaintiff seeks an order certifying the class and appointing him as class representative and class co-counsel, damages in excess of $5,000,000 for the putative class and in excess of $75,000 for Plaintiff individually, injunctive and equitable relief, and attorneys' fees. *Id.* at 25.

## II.   STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if it is accompanied by sufficient factual content to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully," but it "is

not akin to a 'probability requirement.'" *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation omitted). In undertaking this analysis, the Court accepts as true all well-pleaded allegations in the complaint, though it need not accept legal conclusions. *Id.* Likewise, conclusory statements are not entitled to the presumption of truth. *Id.* at 678-79.

In the case of a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, it is the plaintiff's burden to establish personal jurisdiction over each defendant. *See OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998). When courts decide a Rule 12(b)(2) motion on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing of personal jurisdiction. *Id.* Courts assume the allegations in the complaint to be true to the extent not contradicted by the defendant's affidavits, and all factual disputes are resolved in the plaintiff's favor. *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011). Conflicting affidavits or declarations are also resolved in the plaintiff's favor. *Creech v. P.J. Wichita, L.L.C.*, 2017 WL 914810, at *1 (D. Kan. 2017).

## III.    ANALYSIS[3]

### A.    Personal Jurisdiction

NEE, NECH, and NEER move to dismiss the claims against them for lack of personal jurisdiction. Doc. 42. In moving to dismiss, NEE, NECH, and NEER have submitted a declaration stating that none of those entities have offices or employees in Kansas, is registered to do business

---

[3]    Defendants' motions to dismiss argue in part that Plaintiff does not have standing to assert claims based on the Development Agreement between the Nemaha County Board of Supervisors and Soldier Creek. *See, e.g.*, Doc. 41 at 4-6. Although the second amended complaint discusses the Development Agreement extensively, Plaintiff clarifies in his response that he is not asserting any claims based on the Development Agreement or any set-back requirements included in it. Doc. 46 at 23-24.

in Kansas, or own any wind turbines or wind projects in Kansas. Doc. 43-1. Plaintiff argues that there is minimum contacts with Kansas, primarily because "NextEra Defendants at all levels have been advertising for full-time jobs in Kansas for years." Doc. 46 at 10.[4]

To establish personal jurisdiction over a defendant, a plaintiff must satisfy both the state long-arm statute and constitutional due process. *Trujillo v. Williams*, 465 F.3d 1210, 1217 (10th Cir. 2006). But because the Kansas long-arm statute reaches as far as federal due process will allow, the issue is narrowed to whether assertion of personal jurisdiction over the defendant would violate due process. *OMI Holdings*, 149 F.3d at 1090. Due process allows a federal court sitting in diversity to exercise personal jurisdiction over a non-resident defendant only so long as there exist "minimum contacts" between the defendant and the forum state. *World-Wide Volkswagen, Co. v. Woodson*, 444 U.S. 286, 291 (1980). This "minimum contacts" standard may be met in two ways— through either "specific" personal jurisdiction or "general" personal jurisdiction. *OMI Holdings*, 149 F.3d at 1090-91.

Plaintiff does not argue that general personal jurisdiction exists over NEE, NECH, or NEER. Thus, the Court focuses on specific jurisdiction. The specific jurisdiction inquiry is two-fold. First, courts must determine whether the defendant has such minimum contacts with the forum "that he should reasonably anticipate being haled into court there." *OMI Holdings*, 149 F.3d at 1091 (citing *World-Wide Volkswagen*, 444 U.S. at 297). And, within this inquiry, courts must determine whether the defendant purposefully directed its activities at residents of the forum state

---

[4]    In addition to arguing minimum contacts, Plaintiff argues that the Court has personal jurisdiction over NEE, NECH, and NEER because jurisdiction over NEC, NEOS, NEPM, and Soldier Creek is not disputed, and he has alleged a joint venture/common enterprise. Doc. 46 at 8-9. But regardless of whether this is a correct statement of law, *see Creech*, 2017 WL 914810, at *6, the argument would necessarily fail because the Court finds below that Plaintiff has not pleaded any facts that support the existence of a joint venture or enterprise. The same is true to the extent Plaintiff contends there is personal jurisdiction over NEE, NECH, and NEER because he has pleaded direct conduct by these parties in Kansas. Doc. 46 at 9. As discussed below, Plaintiff does not contend that any Defendants are the alter ego of the others. *See Butler v. Daimler Trucks N. Am., LLC*, 2020 WL 4785190, *4 (D. Kan. 2020).

and whether the plaintiff's claim arises out of actions by the defendant itself that create a substantial connection with the forum. *Id.* Second, if the defendant's actions create the requisite minimum contacts, courts must then consider whether exercising personal jurisdiction over the defendant would offend "traditional notions of fair play and substantial justice." *Id.*

      **1.**    **NEE**

For NEE, Plaintiff relies on some online job postings for positions in Kansas that reference NEE. Doc. 46 at 10-12. Defendants argue this isn't sufficient, and even if it could establish specific personal jurisdiction, the "web-based job listings for jobs in Kansas" are not relevant to the operative facts of this case. Doc. 50 at 9. Defendants also point out that references to "NextEra Energy" is not necessarily a reference to NEE. *Id.* at 9-10. Accordingly, the Court finds Plaintiff has failed to make a prima facie case that this Court has personal jurisdiction over NEE.

      **2.**    **NEER**

Regarding NEER, Plaintiff points to job postings in Kansas under the name of NEER, the existence of employees in Kansas purporting to be employed by NEER, promotional materials sent by NEER to Kansas residents about Kansas wind-turbine projects, and a storefront for NEER in Seneca, Kansas. Doc. 46 at 13-14. Plaintiff also submits an affidavit that disputes Defendants' declaration as to NEER. Doc. 46-1.

The alleged NEER employees identified by Plaintiff have provided declarations stating that they are actually employed by NEPM, although their business cards use a brand logo for either NEE or NEER. Doc. 50-2; Doc. 50-3. Another declaration states that the rental payments for the storefront in Seneca, Kansas were made on behalf of Soldier Creek and NEC, and that NEE, NEER, and NECH never made lease payments for the property. Doc. 50-4. Finally, a fourth declaration states that references to NEE or NEER on job postings "is a generic reference to the

spectrum of NextEra subsidiaries and affiliates" and does not mean that NEE or NEER is searching for employees in Kansas. Doc. 50-1; *see also* Doc. 50 at 11-12.

Based on this conflicting evidence, the Court is not in a position to conclude that it lacks personal jurisdiction over NEER. This is because all conflicting questions of fact at this stage must be resolved in favor of Plaintiff. *Shrader*, 633 F.3d at 1239; *Creech*, 2017 WL 914810, at *1. Accordingly, NEER's request to dismiss for lack of personal jurisdiction is denied without prejudice.[5]

### 3.   NECH

As to NECH, Plaintiff only repeats the paragraph in the second amended complaint that reiterates his contention about a joint venture. Doc. 46 at 10. NECH is not otherwise mentioned, and thus the Court finds that Plaintiff has failed to make a prima facie showing of personal jurisdiction over NECH in Kansas.

Accordingly, NEE's and NECH's motion to dismiss for lack of personal jurisdiction is granted, but NEER's request is denied without prejudice.[6]

### B.   Nuisance

NextEra Defendants argue that Plaintiff has not stated a nuisance claim against them because they are not the owner or operator of the project in Nemaha County. Doc. 41 at 6-7; Doc. 43 at 11-13. All Defendants—NextEra Defendants and Soldier Creek—additionally argue that Plaintiff fails to sufficiently allege the elements of nuisance on Counts 1 and 2. Doc. 41 at 7-12;

---

[5]   As discussed below, however, the Court finds Plaintiff has failed to state a claim against NEER, along with any NextEra Defendant.

[6]   Plaintiff additionally argues that "at the very minimum enough of a question has been raised to compel a denial of Defendants' joint motions until after discovery is made available on these questions." Doc. 46 at 18. To the extent Plaintiff is requesting jurisdictional discovery, the Court denies that request because it alternatively finds that Plaintiff has failed to plead sufficient facts that would connect any NextEra Defendants to the project, as stated below, and thus has failed to state a claim against NextEra Defendants.

Doc. 43 at 13-17. The Court first considers whether Plaintiff has stated a claim against NextEra Defendants, and then considers whether Plaintiff has plausibly alleged nuisance.

### 1.      NextEra Defendants

The parties don't dispute that Soldier Creek is the actual owner and operator of the wind-turbine project in Nemaha County. *See* Doc. 41 at 2, 7; Doc. 43 at 2, 13; Doc. 46 at 4-5. Next Era Defendants accordingly argue that the second amended complaint does not state a claim against them because they are not the owner or operator of the project. They argue that Plaintiff's conclusory allegation that there was a "joint venture and common enterprise" does not satisfy pleading standards and does not justify disregarding the separateness of corporate entities. Doc. 41 at 7; Doc. 43 at 12.

The Court has struggled somewhat to discern precisely the grounds on which Plaintiff believes he can hold Defendants liable for the conduct about which he complains, especially given that it is undisputed that only Soldier Creek is the owner and operator of the project. The second amended complaint alleges that Defendants are all related through a parent-subsidiary relationship. *See* Doc. 35 at ¶¶ 4-6. But "a holding or parent company has a separate corporate existence and is treated separately from the subsidiary in the absence of circumstances justifying disregard of the corporate entity." *Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358, 1362 (10th Cir. 1974); *see also United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law . . . that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."); *Heslop v. UCB, Inc.*, 175 F. Supp. 2d 1310, 1317 (D. Kan. 2001) ("The fact that one corporation is the parent of another, however, is not sufficient to warrant treating the two corporations as one without a showing that one exercises undue control over the internal affairs of the other.").

Nor does Plaintiff suggest that Defendants are merely alter egos for each other or that piercing the corporate veil is otherwise necessary. *See Quarles*, 504 F.2d at 1362; *see also Cyprus Amax Mins. Co. v. TCI Pac. Commc'ns, LLC*, 28 F.4th 996, 1007-08 (10th Cir. 2022) (explaining when the "presumption of corporate separateness" can be overcome). Instead, Plaintiff argues that he has "alleged direct liability by those individual entities' actions but also joint and several liability to all Defendants based on a joint venture/common enterprise theory." Doc. 46 at 4*; see also id*. at 8. But other than frequently repeating this refrain, Plaintiff does little to actually show that is the case. The Court nevertheless considers each of Plaintiff's theories of liability; joint and several liability, joint venture or common enterprise, and direct liability.

### a.      Joint and Several Liability

Plaintiff claims he has alleged joint and several liability. But simply alleging joint and several liability, *see id.* at 8, does not establish that Defendants are jointly and severally liable for the actions of the others. Joint and several liability is a legal conclusion not entitled to the presumption of truth. *See Iqbal*, 556 U.S. at 678. And there must be a legal basis to reach that conclusion, which Plaintiff has not shown.[7]

### b.      Joint Venture or Common Enterprise

Plaintiff alleges that Defendants are liable "based both on a joint venture and/or common enterprise theory of liability . . . ." Doc. 46 at 8. "A joint venture is defined as an association of two or more persons or corporations formed to carry out a single business enterprise for profit and may be found in the mutual acts and conduct of the parties." *Wheat v. Kinslow*, 316 F. Supp. 2d 924, 930 (D. Kan. 2003). "A joint enterprise is defined as an undertaking to carry out an act or

---

[7]    To the extent Plaintiff contends joint and several liability applies because the parties have formed a joint venture or common enterprise, that is addressed separately.

objective which is entered into by associates under such circumstances that all have an equal voice in directing the conduct of the enterprise." *Id.* (internal quotation and citation omitted). The terms are often used interchangeably, but the primary distinction is that "a business relationship is necessary to create a joint venture, but not to create a joint enterprise." *Id.* The elements of either are essentially the same: "(1) the joint ownership and control of property; (2) the sharing of expenses, profits and losses, and having and exercising some voice in determining the division of the net earnings; (3) a community of control over and active participation in the management and direction of the business enterprise; (4) the intention of the parties, express or implied; and (5) the fixing of salaries by joint agreement." *Cuiksa v. Hallmark Hall of Fame Prods., Inc.*, 252 F. Supp. 2d 1166, 1178–79 (D. Kan. 2003); *see also Meyer v. Christie*, 634 F.3d 1152, 1158 (10th Cir. 2011).[8]

Although the second amended complaint states that "[t]he array of Defendant subsidiaries and affiliates form the same joint venture and common enterprise related to Plaintiff's and the putative class'[s] claims," Doc. 35 at ¶ 7, Plaintiff pleads no facts that would plausibly show this to be the case. At most, Plaintiff alleges that NEER, NEC, NEOS, and NEPM, along with Soldier Creek, are subsidiaries of NEE and NECH and "are substantially controlled by and share key executive officers, decision-making processes and personnel, the same corporate headquarters offices and facilities, shared work processes, and same exact address with" NEE and NECH. *Id.* ¶¶ 4-6. But the only one of these statements backed up by an actual fact is that all Defendants have

---

[8]   Other courts phrase the factors used to determine a joint venture exists differently: "(1) an agreement, (2) a common purpose, (3) a community of interest, and (4) an equal right to a voice, accompanied by an equal right of control over the instrumentality." *Liechty v. Bethel Coll.*, 2020 WL 954033, at *4 (D. Kan. 2020) (quoting *Cullip ex rel. Pitts v. Domann ex rel. Domann*, 972 P.2d 776, 783 (Kan. 1999)). There is some overlap in these differently phrased factors, however. Further, the Tenth Circuit has cautioned that the factors "are not exclusive or outcome-determinative." *Meyer*, 634 F.3d at 1158. As discussed, any distinction in the factors considered is largely irrelevant in the current case because Plaintiff pleads almost no facts on this issue at all.

their principal place of business at the same Florida address. *See id.* ¶ 8. Further, even if these entities do share officers, personnel, and the same office space, that doesn't allege the existence of a joint venture. Plaintiff's conclusory allegations on this point are not sufficient. *Iqbal*, 556 U.S. at 678.

### c.    Direct Liability

That leaves Plaintiff's alternative contention that he has also pleaded direct action by NextEra Defendants that renders them liable for his claims. *See* Doc. 46 at 9. On this issue, the Court again notes that the second amended complaint is thin. There are only minimal allegations of direct action by Defendants, and those allegations are highly conclusory:

- NEE "jointly, severally and actively participated in approval, development and the decision to develop at that location, oversight, ratification, direction, and/or supervision vis-à-vis other Defendants' actions related to the nuisances in this case." Doc. 35 at ¶ 9.

- NECH "jointly and severally participated in financing and economic activities directly . . . related to the nuisances that continue to harm Plaintiff." *Id.* ¶ 10.

- NEER "was directly involved both in and out of Kansas with all aspects to include but not be limited to preparation, development, the decision to develop at that location, finance, construction, compliance, regulatory and legal, public interface and communications as well as follow-on operations to include but not be limited to all aspects surrounding the turbine towers built and operated along the western fence line of Plaintiff's property described above." *Id.* ¶ 11.a.

- NEC: "based on its name alone it is reasonably certain to have been involved with aspects of the siting, approval, quality assurance, placement, and construction of the turbine towers that continue to harm Plaintiff." *Id.* ¶ 11.b.

- NEOS: "based on its name alone it is reasonably certain to have been involved with aspects of the siting, approval, quality assurance, and other activity concerning the development and

current operations of turbine towers that continue to harm Plaintiff." *Id.* ¶ 11.c.

- NEPM: "based on its name alone it is reasonably certain to have been involved with aspects of the siting, approval, quality assurance, and other activity concerning the development and current operations of turbine towers that continue to harm Plaintiff." *Id.* ¶ 11.d.

As to NEC, NEOS, and NEPM, their "directly liable conduct," Doc. 46 at 9, seems to be based on a supposition because of their names. And all of these allegations are otherwise completely conclusory and are not accompanied by any actual facts that would push these allegations across the line of plausibility. *See Iqbal*, 556 U.S. at 678.

Plaintiff does not allege that any of these entities currently owns or operates the wind turbines about which he complains. Nor does he explain how their involvement at some point in the construction of the wind turbines renders them directly liable for nuisance under Kansas law. If these allegations were sufficient to do that, it would seem that any individual who had any part in the construction of the wind turbines, from the banker to the construction worker, could equally be liable for nuisance after the fact despite the fact they do not currently own or operate the wind turbine project.[9]

Plaintiff seems to acknowledge that the project is owned and operated by Soldier Creek. *See* Doc. 46 at 4. But he also claims that the "real tortfeasors in these cases are the ones that decided to put the wind farm in the populated area" and that such decisions "were likely made high up by officers and directors of the richer NextEra parent corporations, not just by the lowest subsidiary entity Defendant Soldier Creek Wind LLC." *Id.* at 3. But Plaintiff has pleaded no facts—nor

---

[9]   Based on the allegations, it appears that none of the wind turbines at issue are built on land actually owned by Defendants. Rather, they are built with permission on land owned by third parties—the so-called "participating landowners" for the project. Neither party addresses, and thus the Court does not consider at this stage, whether any nuisance claim is properly aimed at the owner and operator of the wind turbines, or the owners of the land on which they sit.

offered any legal argument—that support any plausible claims against NextEra Defendants. Indeed, he seems to acknowledge that much of his case is just a hunch at this point, as he argues that "Defendants have exclusive knowledge of who made these decisions and when, as well as who carried the decisions out" and that the "assertions in their joint motions require a denial until further discovery can definitively determine critical material facts." *Id.* at 4-5; *see also id.* at 19 ("As to the corporate involvement of each Defendant, this also involves the concept of 'peculiar knowledge' of Defendant corporations. Only the Defendants[] know how the key decisions were made, and by whom, to pick on the good people of Nemaha County . . . ."); *id.* at 20 ("They are using a motion to dismiss to conduct a shell game with the details of what person from which corporation did this to Plaintiff. Discovery is needed to flesh it out."). But hopes of fruitful discovery is not enough to defeat a motion to dismiss. *Iqbal*, 556 U.S. at 678-79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

Plaintiff finally claims that the "totality of evidence" shows a "clear disregard of the corporate entities justifying a full denial of their joint motions to dismiss." Doc. 46 at 19. He suggests that the Defendants' collective dishonesty shows they cannot "be trusted to not, mislead, [sic] on everything else to include the direct involvement in this and other massive Kansas development investment projects . . . ." *Id.* Such aspersions—which are sprinkled throughout the briefs on both sides—are not welcome or helpful. More importantly, the issue currently before the Court is the quality of Plaintiff's allegations, not Defendants' credibility or character. Because Plaintiff has not pleaded facts suggesting that NextEra Defendants are the owners or operators of the wind turbines about which he complains, nor has he pleaded facts showing a basis for joint and

several liability, a joint venture or common enterprise, or direct liability, his claims against NextEra Defendants are dismissed.

### 2.     Soldier Creek

Defendants alternatively argue that Plaintiff fails to state a claim for nuisance. Because the Court has concluded that there are no facts alleging that any NextEra Defendant is the owner or operator of the project, or any grounds for liability as to Next Era Defendants, the Court considers this argument only as to Soldier Creek, who the parties agree is the owner and operator of the project in Nemaha County.

"Intentional private nuisance is a tort relating to the intentional and unlawful interference with a person's use or enjoyment of his or her land." *Byers v. Snyder*, 237 P.3d 1258, 1268 (Kan. Ct. App. 2010). It has four elements:

> (1) [T]he defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use; (2) there was some interference with the use and enjoyment of the land of the kind intended, although the amount and extent of that interference may not have been anticipated or intended; (3) the interference that resulted and the physical harm, if any, from that interference proved to be substantial; and (4) the interference was of such a nature, duration, or amount as to constitute unreasonable interference with the use and enjoyment of the land.

*N. Nat. Gas Co. v. L.D. Drilling, Inc.*, 697 F.3d 1259, 1267 (10th Cir. 2012) (citation omitted). Plaintiff alleges in the alternative nuisance based on negligence. Doc. 35 at ¶ 35.[10]

---

[10] Defendants state that negligent acts cannot constitute a nuisance under Kansas law. *See, e.g.*, Doc. 41 at 11. But the Kansas Supreme Court has stated that a nuisance can be based on a negligent act. *United Proteins, Inc. v. Farmland Indus., Inc.*, 915 P.2d 80, 85 (Kan. 1996); *see also Culwell v. Abbott Const. Co.*, 506 P.2d 1191, 1196 (Kan. 1973) ("In other words a nuisance may result from conduct which is intentional or negligent or conduct which falls within the principle of strict liability without fault. The point is that nuisance is a result and negligence is a cause and they cannot be distinguished [otherwise]."); *Macias v. BNSF Ry. Co.*, 2020 WL 3469680, at *8 (D. Kan. 2020) ("But a private nuisance action may be brought on a theory of intentional conduct, negligence or strict liability.").

Defendants argue that "Plaintiff fails to allege any facts to support his purported nuisance claims including the specific location of this unidentified property and what harm purportedly resulted to Plaintiff." Doc. 41 at 8. The Court disagrees. Although short on particulars, the second amended complaint clearly alleges that the wind turbine adjoining Plaintiff's land, which is identified by legal description, Doc. 35 at ¶ 3, has disrupted construction plans he had for the property because of the "looming wingspan, noise, and shadow of the turbine tower's massive arms." *Id.* ¶ 31. Further, although not particular to Plaintiff's own land, the second amended complaint includes allegations of how wind turbines interfere with the use and enjoyment of land. *Id.* ¶ 15. Although the Court agrees that Plaintiff often speaks in broad generalities, it disagrees that his claim of nuisance is based on a public nuisance. The Court also disagrees that plaintiff's allegations are limited to aesthetic injury.

Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's nuisance claim as to Soldier Creek, as the parties agree it is the owner and operator of the project, and because Plaintiff has plausibly alleged a claim of nuisance.

### C.    Class Claim

Plaintiff seeks to bring a class action for declaratory judgment. Doc. 35 at ¶¶ 39-64. As grounds for this claim, Plaintiff alleges that Defendants defraud homeowners into becoming participants in wind-farm projects by misrepresenting the nature or inevitability of the projects, and then "induce the victims to unilaterally sign written contracts" while knowing that "they never intend to send the counter party back the signed, allegedly executed contract[] copy thereby making their conduct and representations concerning the operative documents false and misleading" and "creating a wide-open power of acceptance." *Id.* ¶ 44. Plaintiff seeks a declaratory judgment "of the nullity and unenforceability, as well as its attainment under false pretenses, of

the signed and allegedly executed contract documents and an accompanying order barring their entry as evidence in this case." *Id.* ¶ 52. It is unclear whether the putative class claim sounds in contract, fraud, or something else.[11]

### 1.    Class Allegations Based on a Joint Venture or Common Enterprise

As a preliminary matter, Plaintiff never identifies which Defendants are implicated by this claim, though it appears to be all of them as he alleges this was done "as a nationwide practice as a joint venture and common enterprise to thousands of unsuspecting putative class members." *Id.* ¶ 48. As discussed above, Plaintiff has not pleaded any facts to show the existence of a joint venture or enterprise. Thus, to the extent his class claim is based on a joint venture or enterprise, dismissal is appropriate.[12]

### 2.    Personal Jurisdiction Over Nationwide Class

Defendants also argue that the Court lacks personal jurisdiction over the claims of non-Kansas putative class members. Doc. 41 at 13; Doc. 43 at 19-20. Defendants rely on a recent District of Kansas case that struck class allegations for a putative class that included claims of nonresidents against a nonresident defendant. *See Stacker v. Intellisource, LLC*, 2021 WL 2646444, at *8 (D. Kan. 2021) ("[T]he court agrees that the due process concerns recognized in *Bristol-Myers* and other Supreme Court precedent would foreclose a nationwide class action that is not limited to a nonresident defendant's conduct in the forum state."). *Stacker* involved a resident plaintiff who purported to bring a nationwide class action against a non-resident defendant. *Id.* at *1. The court found it had specific personal jurisdiction over the defendant as to the plaintiff's

---

[11] Nor is it clear precisely what relief is sought, as Plaintiff phrases the class claim as one for declaratory judgment, but then also seeks judgment for damages in excess of $5,000,000.

[12] Although it is not entirely clear that Defendants intended this argument to apply to Plaintiff's class claim, NextEra Defendants have moved to dismiss "all" claims asserted against them because they are not the owner or operator of the wind turbine project in Nemaha County. Doc. 41 at 6-7; Doc. 43 at 11-13. Because of this, and because Plaintiff incorporates that allegation into his class claim, the Court applies it here as well.

claims, but not general personal jurisdiction. *Id.* at *3-6. The defendant then moved to dismiss the class allegations for lack of personal jurisdiction because the conduct as to the nationwide class did not necessarily occur in Kansas. *Id.* at *3. *Stacker* stated:

> A defendant should not be required to litigate claims that have no connection to this state solely because the claims are those of unnamed class members. The fact that these claims involve common questions of fact and law and could be certified as a class action under Rule 23 do not make Defendant's due process rights "vanish."
>
> . . . .
>
> Although Plaintiff has not yet moved for class certification, the court finds as a matter of law that it could not certify Plaintiff's proposed nationwide class action against Defendant because it could include claims of class members that have no connection to Kansas and would be subject to dismissal due to lack of personal jurisdiction. Therefore, Plaintiff is foreclosed from representing a nationwide class action in this forum.

*Id.* at *10-11 (citation omitted).

The facts of *Stacker* are functionally similar to this case, and the Court finds its reasoning persuasive. Here, Plaintiff asserts a claim against Defendants that allegedly accrued in Kansas. But he also seeks to bring a class action on behalf of property owners whose claims likely have no connection to Kansas. There is no argument made or facts alleged that the Court has general personal jurisdiction over Defendants that would make this nationwide class claim proper. To the contrary, the Court notes that Plaintiff <u>completely ignores</u> this argument and makes no attempt to show that the Court has personal jurisdiction over his nationwide class claims, which is his burden. *OMI Holdings*, 149 F.3d at 1091.[13] Accordingly, as the Court found in *Stacker*, the appropriate

---

[13] NEC, NEOS, NEPM, and Soldier Creek have not moved to dismiss for lack of personal jurisdiction. Thus, while it seems undisputed that the Court has personal jurisdiction over them to at least some claims in this case, Plaintiff's collective pleading style and failure to respond to this argument leave the Court unable to find that it has personal jurisdiction over any Defendants as to the putative nationwide class claim.

action is striking the class claims because the class could not be certified. *See Stacker*, 2021 WL 2646444, at *11.

### 3.     Rule 23

Defendants alternatively move to strike Plaintiff's class allegations because he cannot satisfy Rule 23. Doc. 41 at 14; Doc. 43 at 20. Again, Plaintiff fails to respond to most of Defendants' arguments. Despite Plaintiff's lack of response, which effectively concedes most of Defendants' points, and although the Court has already found that the class claims should be stricken, the Court will briefly address some of Defendants' Rule 23 arguments, specifically that Plaintiff's claims are not typical of the putative class and that the proposed class lacks commonality. The Court finds that Plaintiff's putative class claim fails under these two elements as well.

Defendants first argue that Plaintiff's claims are not typical of the class he seeks to represent because he rejected and withdrew from any contract he had with Defendants and therefore doesn't meet the proposed class definition. Doc. 41 at 15-16; Doc. 43 at 21-22. Rule 23(a)(3) states that a prerequisite of a class action is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Here, Plaintiff seeks to represent a class of property owners "who signed alleged land use documents . . . and never received a copy of the countersigned, or allegedly executed, final documents back from Defendants but were led to believe a land use related contract thereby was created by those same documents." Doc. 35 at ¶ 55. For relief, he seeks a declaratory judgment "of the nullity and unenforceability" of those documents. *Id.* ¶ 52. But Plaintiff also pleads facts suggesting that, to the extent he had a contract with Defendants, he repudiated it, Defendants acknowledged the repudiation, and "no land use contract or agreement existed between any Defendant and Plaintiff in this case." *Id.* ¶¶ 27-

30. Thus, Plaintiff purports to represent a class of people allegedly beholden to contracts that he is not beholden to. *See Emig v. Am. Tobacco Co.*, 184 F.R.D. 379, 385 (D. Kan. 1998) ("The consequence of typicality is that the named plaintiffs' interests are aligned with the proposed class, and in pursuing their own claims, the named plaintiffs will also advance the interests of the class."). Accordingly, his claim does not appear typical of the class. *See Thompson v. Jiffy Lube Int'l, Inc.*, 250 F.R.D. 607, 622 (D. Kan. 2008) ("A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3).").

Defendants also argue that Plaintiff cannot satisfy commonality requirements. Rule 23(a)(2) requires class actions to have "questions of law or fact common to the class." Defendants argue that this Court would have to apply the law of the state where each putative class member entered into contracts with Defendants or relied on alleged misrepresentations. Doc. 41 at 19-23; Doc. 43 at 25-29; *see also Andy's Towing, Inc. v. Bulldog Bldg. Sys., Inc.*, 2011 WL 2433679, at *3, *5 (D. Kan. 2011) (noting that Kansas follows *lex loci contractus* (the place where the contract was made) and *lex loci delicti* (the place where a tortious wrong occurred)). Further, each class member would have to establish reliance on any alleged misrepresentations, which would "necessitate potentially hundreds of mini-trials." Doc. 41 at 22; Doc. 43 at 28. Again, Plaintiff doesn't address this issue.[14] But the Court agrees with Defendants that the putative class claim in this case seems unsuited for class adjudication. *See Harding v. Tambrands Inc.*, 165 F.R.D. 623,

---

[14] The second amended complaint states that the common questions of law or fact are "[w]hether Defendants' conduct runs contrary to the statute of frauds, constitutes false pretenses, or otherwise is a violation of common law, state or federal statute or public policy, in that they concealed the actual signed and/or allegedly executed real property land use documents from counterparties ensuring that there was no mutuality of obligation as only they could enforce, or at a minimum be materially and unlawfully advantaged, under the circumstances of these alleged 'agreements.'" Doc. 35 at ¶ 60. But this seems to invoke the precise problems of commonality identified by Defendants.

629 (D. Kan. 1996) ("However, significant common issues of law are lacking due to the many variations in the law of the various jurisdictions on each of the claims.").

For these reasons, the Court agrees with Defendants that Plaintiff's class claim should be stricken. *See Hull v. Viega, Inc.*, 2013 WL 759376, at *3 (D. Kan. 2013) ("Significantly, several courts have recently stricken class allegations on the pleadings in putative nationwide consumer class action cases where, as alleged in this case, manageability, choice of law, and acertainability issues would prevent certification.").[15]

### D.     Inverse Condemnation

Finally, the second amended complaint asserts a claim for "inverse condemnation under government authority." Doc. 35 at ¶¶ 65-69. Plaintiff alleges the project at issue was a "public works project" that required resolution of local land use and county permitting issues and that Defendants misled the Nemaha County Board of Supervisors. According to Plaintiff, "[b]y undertaking the responsibilities and actions to inform the Board on such matters, NextEra Defendants were acting under authority of the Board" on various matters and "readily undertook to act in this specific capacity and circumstance that directly affected Plaintiff under color of government authority." *Id.* Plaintiff contends that the placement of wind turbines at locations less than the agreed set-back distance is a taking under the 5th Amendment and under Kansas law that Defendants are liable for because they "caused the government to 'agree' to, and thus authorize, these takings." *Id.*

---

[15] The only argument regarding his class claim to which Plaintiff responds is Defendants' argument that he cannot serve as both class representative and class counsel. Doc. 46 at 27-29. The Court shares Defendants' concerns about possible conflicts, although it notes that Plaintiff does have co-counsel, whose relation to Plaintiff is not clear, and whose existence the parties seem to ignore. Because the Court finds Plaintiff's class claims should be stricken for alternative reasons discussed above, it does not reach this issue, nor does it reach Defendants' argument that Plaintiff's proposed class definition fails as a matter of law.

An inverse-condemnation claim is essentially the reverse of an eminent-domain claim. Eminent domain refers to the power "of a governmental entity to take private property for public use without the owner's consent upon payment of just compensation." *Garrett v. City of Topeka*, 916 P.2d 21, 30 (Kan. 1996). In an eminent-domain action, the governmental entity institutes the action to take property. *Estate of Kirkpatrick v. City of Olathe*, 215 P.3d 561, 565 (Kan. 2009). By contrast, inverse-condemnation proceedings are bought by the party who owns property to allege that the property was taken for public use without the initiation of condemnation proceedings by the governmental entity. *Id.*; *see also Mid Gulf, Inc. v. Bishop*, 792 F. Supp. 1205, 1212 (D. Kan. 1992) ("Kansas courts have routinely held that for inverse condemnation to lie, it is usually required that an entity with eminent domain authority acquire possession of the property in question and control the property to the exclusion of the owner.").

Defendants move to dismiss this claim because they are not a governmental entity that could effect a taking of property, nor do they have the power of eminent domain. Doc. 41 at 12-13; Doc. 43 at 18. Plaintiff argues that there is no requirement that an inverse-condemnation claim "cannot be brought against a private entity that participates in the taking if acting under governmental authority." Doc. 46 at 25.

But in *Macias*, a case cited by Plaintiff in the second amended complaint, the plaintiffs tried to assert an inverse-condemnation claim against a railroad because it "worked in tandem" with the governmental entity. 2020 WL 3469680, at *9. The court dismissed the railroad because there were no allegations that it was a governmental entity or acted with governmental authority. *Id.* Despite the plaintiffs' argument that the railroad worked with the governmental entity, "this allegation does not suggest that [the railroad] somehow had the authority to take private property through condemnation proceedings." *Id.* The same is true in this case. Although Plaintiff alleges

that Defendants somehow manipulated governmental authorities to allow them to build wind turbines, there are no allegations that Defendants have—or had—the authority to take property through condemnation proceedings.[16] Further, although Plaintiff alleges that Defendants had to work with government officials to resolve "certain local land use and county permitting issues for the use of land, roadways, and other facilities," this is not sufficient to convert Defendants' private project into a government taking. If Plaintiff's argument were correct, any request for zoning changes or permits could open up any private development to claims of inverse condemnation.

Plaintiff relies on three cases to support his position that he can assert an inverse-condemnation claim against private entities. The first is *Kelo v. City of New London, Conn.,* 545 U.S. 469 (2005). Plaintiff cites this case for the holding that "a state could legally take a person's property and give it to another for a public use," but that the Constitution requires that "the victims receive just compensation." Doc. 46 at 25. But *Kelo* involved a private development entity that had been authorized to initiate—and had initiated—condemnation proceedings. *Kelo*, 545 U.S. at 475. Here, however, there are no allegations that anyone—whether a governmental entity or Defendants—have initiated condemnation proceedings or exercised the power of eminent domain.

The second is *Ossman v. Mountain States Telephone & Telegraph Co.*, 511 P.2d 517 (Colo. App. 1973).[17] That case involved a landowner suing a phone company for trespass. *Id.* at 519. The phone company argued that the landowner's only cause of action was for inverse condemnation. *Id.* The court found that the phone company's defense should be treated as a counter-petition for eminent domain. *Id.* If the taking was deemed not proper, the plaintiff's trespass claim could

---

[16]  Plaintiff's allegation that Defendants acted "under color of government authority," Doc. 35 at ¶ 66, is conclusory and unsupported by facts that would make this allegation plausible.

[17]  The Colorado Supreme Court reversed this Colorado Court of Appeals decision. *Ossman v. Mountain States Tel. & Tel. Co.*, 520 P.2d 738 (Colo. 1974). Plaintiff doesn't address this, but as discussed, the Colorado Court of Appeals decision is not on point in any respect.

continue. *Id.* at 520. But if the taking was proper, the landowner could still get condemnation damages. *Id.* The Court struggles to see the relevance of this case to the current dispute. In *Ossman*, there was no dispute that the phone company had the power of eminent domain (though the plaintiff argued it refused to use it). *Id.* at 518. Defendants do not have that power here, which is why they argue an inverse-condemnation claim against them cannot lie.[18]

The third is *George Ward Builders, Inc. v. City of Lee's Summit*, 157 S.W.3d 644 (Mo. Ct. App. 2004). But the Court again struggles to see the relevance of this case to the current dispute. In *George Ward Builders*, a landowner sued a city because the city's park lights were creating a nuisance. *Id.* at 646. The issue was whether a nuisance action could be brought against a municipality, and the court found that was not proper because "when private property is damaged by a nuisance operated <u>by a public entity with condemning authority</u>, regardless of whether the nuisance is temporary or permanent, the exclusive and proper remedy is inverse condemnation." *Id.* at 650 (emphasis added). This doesn't address the issue here, where the alleged nuisance is owned and operated by a private entity.

In sum, Plaintiff has not shown that he may assert an inverse-condemnation claim against a private entity who has not—and could not—initiate condemnation proceedings or exercise the power of eminent domain. This claim must be dismissed.[19]

---

[18]  Plaintiff also cites *Ossman* for its reliance on *Garden Water Corp. v. Fambrough*, 245 Cal. App. 2d 324 (Cal. Dist. Ct. App. 1966). But that case only speaks to inverse condemnation generally—it does not address whether a private party can be sued for inverse condemnation. *Id.* at 326-27.

[19]  Plaintiff contends that this claim is only asserted as an alternative to his private nuisance claim, because even if Defendants are correct that the wind turbines are not nuisances, "they still have to pay for taking away the use and enjoyment of property under the Fifth and Fourteenth Amendments to the U.S. Constitution." Doc. 46 at 24-25. Although it's unclear how there would be a compensable taking if there was no nuisance, Plaintiff may not sustain a legally untenable claim just because it is asserted in the alternative.

IV.     CONCLUSION

The Court dismisses NextEra Defendants because they are not the owner or operator of the project, and because NEC and NECH are not subject to personal jurisdiction of this Court. The Court strikes Plaintiff's putative class claim and dismisses his claim for inverse condemnation. However, Plaintiff has stated a nuisance claim against Soldier Creek. The remaining parties are Plaintiff and Defendant Soldier Creek, and the surviving claim is a claim for nuisance.

THE COURT THEREFORE ORDERS that Defendants NEC, NEOS, NEPM, and Soldier Creek's Motion to Dismiss the Second Amended Complaint for Failure to State a Claim (Doc. 40) is GRANTED IN PART AND DENIED IN PART.

THE COURT FURTHER ORDERS that Defendants NEE, NECH, and NEER's Motion to Dismiss the Second Amended Complaint for Lack of Personal Jurisdiction and Failure to State a Claim (Doc 42) is GRANTED IN PART AND DENIED IN PART.[20]

IT IS SO ORDERED.

Dated: July 25, 2022               /s/ *Holly L. Teeter*
                                   HOLLY L. TEETER
                                   UNITED STATES DISTRICT JUDGE

---

[20] "Courts have discretion under 28 U.S.C. § 1631 to cure jurisdictional defects by transferring a case to a district where it could have been brought." *Tomelleri v. MEDL Mobile, Inc.*, 657 F. App'x 793, 796 (10th Cir. 2016). Neither party discusses or advocates for a transfer under section 1631. In the interest of completeness, the Court does not find that transfer is appropriate as to the dismissed claims and parties. Section 1631 refers to transfer of an "action" and the Court has found that some of Plaintiff's claims survive and will remain in the District of Kansas. The Court has also found that Plaintiff has failed to state a claim against the dismissed parties because they are not the owner or operator of the project.